Case No.:  23-11005-D

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

MARGARITA RODRIGUEZ-BONILLA

     Plaintiff/Appellant,

v.

WAYNE IVEY, et al.

     Defendants/Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida, Orlando Division
Case No.: 6:21-cv-00428-JA-DAB

_____

## RESPONSE TO JURISDICTIONAL QUESTION
## BY DEFENDANTS/APPELLEES IVEY, FAYSON,
## ZIMMERMAN AND WAGNER, JR.

THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:      407-673-5000
Facsimile:      321-203-4304
Attorney for Defendants/Appellees
Ivey, Fayson, Zimmerman and
Wagner, Jr.

Case No.:  23-11005-D

*Margarita Rodriguez-Bonilla v. Wayne Ivey, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

Antoon, Honorable John – U.S. District Judge in court below

Armor Correctional Health Services, Inc. – Defendant in case below

Baker, Honorable David  A. – Magistrate Judge in court below

DeBevoise & Poulton, P.A. – Attorneys for Defendants/Appellees
        Sheriff Ivey, Fayson, Zimmerman, Wagner, Jr.

Fayson, George – Defendant/Appellee

Florida Sheriffs Risk Management Fund – Liability Coverage for
        Defendants/Appellees Sheriff Ivey, Fayson, Zimmerman, Wagner, Jr.

Friedman, Jason R. – Attorney for Defendants Nadeau, Robinson, Jones and
        Armor Correctional in case below

Ivey, Wayne, Sheriff of Brevard County – Defendant/Appellee

Jones, Yolanda – Defendant in case below

Kmiec, Katherine N. – Attorneys for Defendants Nadeau, Robinson, Jones and
        Armor Correctional in case below

Kubicki Draper, P.A. – Attorneys for Defendants Nadeau, Robinson, Jones and
        Armor Correctional in case below

Nadeau, Debora – Defendant in case below

C1 of 2

Poulton, Thomas W. – Attorneys for Defendants/Appellees Sheriff Ivey, Fayson, Zimmerman, Wagner, Jr.

Robinson, Ayana – Defendant in case below

Rodriguez-Bonilla, Margarita – Plaintiff/Appellant

Wagner, Jr., Robert – Defendant/Appellee

Zimmerman, Richard – Defendant/Appellee

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5, Defendants/Appellees Ivey, Fayson, Zimmerman and Wagner, Jr. have no corporations to disclose.

## RESPONSE TO JURISDICTIONAL QUESTION

Defendants/Appellees Sheriff Wayne Ivey, George Fayson, Richard Zimmerman and Robert Wagner, Jr., by and through undersigned counsel and pursuant to the Court's Jurisdictional Question issued April 14, 2023, hereby respond as follows:

> **Please address who is the proper appellant and whether Margarita Rodriguez-Bonilla, who purports to be the personal administrator of the estate of Gregory Lloyd Edwards, may represent the estate while proceeding *pro se*. *See Reshard v. Britt*, 839 F.2d 1499 (11th Cir. 1988) (en banc) (evenly split panel affirming by operation of law a district court's order disqualifying the deceased's estate representatives from proceeding *pro se* in a wrongful death suit); *Devine v. Indian River Cnty. Sch. Bd.*, 121 F.3d 576, 582 (11th Cir. 1997) (explaining that even though 28 U.S.C. § 1654 grants parties the ability to "plead and conduct their own cases personally or by counsel," it does not grant the ability to plead or conduct someone else's case), *overruled on other grounds by Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 127 S. Ct. 1994 (2007); *see also, e.g., Malone v. Nielson*, 474 F.3d 934, 937 (7th Cir. 2007) (persuasive) ("Although individuals have a right to proceed *pro se* . . . administrators do not act on behalf of themselves, but on behalf of all of the beneficiaries of an estate. Consequently, if the administrator is not the sole beneficiary of the estate, then he or she may not represent the estate in court." (citations omitted)); *Franklin v. Garden State Life Ins.*, 462 F. App'x 928, 930 (11th Cir. 2012) (unpublished) (concluding that a non-attorney was not permitted to proceed *pro se* on behalf of an estate even if she was the estate's executor). *But see Reshard*, 839 F.2d at 1499-1504 (Tjoflat, J., dissenting).

Just a few days after the jurisdictional question was raised by the Court in this case, the Court issued its opinion in *Iriele v. Griffin*, ___ F.4th ___, 2023 WL 2964512 (11th Cir. April 27, 2023). In that case, this Court squarely adopted the rule that, where the personal representative of an Estate is not the sole beneficiary or where there are creditors, then the personal representative may not proceed pro se.

We start by answering the question posed by the district court, which up until now we have left unanswered: can an executor of an estate file a lawsuit in federal court *pro se* on behalf of the estate where there are additional beneficiaries of the estate, other than the executor, and/or where the estate has outstanding creditors? 28 U.S.C. § 1654 provides: "In all courts of the United States the parties may plead and conduct *their own cases* personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." (emphasis added). Equally divided sitting *en banc*, we previously offered no opinion on this issue. *Reshard v. Britt*, 839 F.2d 1499, 1499 (11th Cir. 1988) (*en banc*). Faced with the issue again today, we hold that, under the terms of § 1654, an executor may not represent an estate *pro se* where there are additional beneficiaries, other than the executor, and/or where the estate has outstanding creditors. In such a situation as exists here, an executor of such an estate does not bring his "own case" and thus the estate must be represented by counsel. 28 U.S.C. § 1654.

We join several of our sister circuits that have reached the same conclusion, prohibiting executors of estates from representing the estate in federal court *pro se* where the estate has additional beneficiaries and/or creditors. *See Pridgen*, 113 F.3d at 393 (creditors of the estate); *Shepherd v. Wellman*, 313 F.3d 963, 970 (6th Cir. 2002) (additional beneficiaries of the estate); Malone v. Nielson, 474 F.3d 934, 937 (7th Cir. 2007) (per curiam) (additional beneficiaries of the estate); *Murray*, 901 F.3d at 171 (holding that a non-beneficiary administrator of an estate cannot represent the estate *pro se*). *See also Guest v. Hansen*, 603 F.3d 15, 21 (2d Cir. 2010) (holding that "the administrator and sole

2

beneficiary of an estate with no creditors may appear *pro se* on behalf of the estate"); *Bass*, 788 F.3d at 230 (holding that a sole beneficiary of an estate without any creditors may represent the estate *pro se*); *Rodgers*, 819 F.3d at 211 (holding that "[a] person with capacity under state law to represent an estate in a survival action may proceed *pro se* if that person is the only beneficiary and the estate has no creditors").

*Iriele* at * 4.

Based on the rule announced in *Iriele*, the answer to the question as presented in this case turns on whether: a) Ms. Rodriguez-Bonilla is the sole beneficiary of the Estate of Gregory Edwards; and/or b) whether there are creditors of the Estate.

### A. **Ms. Rodriguez-Bonilla is not a beneficiary of the Estate of Gregory Edwards and there are other beneficiaries of the Estate.**

The operative complaint is the Second Amended Complaint (Dkt. 42). A copy is attached as Exhibit A to this response.  It states in paragraph 20 that Ms. Rodriguez- Bonilla, represented at the time by counsel, was asserting claims "on behalf of the ESTATE and BENEFICIARIES as permitted by law."

The beneficiaries are not identified in the complaint as such; however, in initial Rule 26 disclosures dated May 5, 2021, Plaintiff identified Ms. Rodriguez-Bonilla as Gregory Edwards' mother-in-law, Kathrine Edwards as Gregory Edwards' wife, and a minor child as Gregory Edwards' daughter. The Rule 26 disclosures were not filed in the district court but are attached to

this response as Exhibit B.  In her deposition, Dkt. 147, Ms. Edwards discussed the minor daughter with regard to receipt of survivor benefits from the Social Security Administration and receiving counseling. See Exhibit C, excerpt from deposition of Kathleen Edwards, Dkt. 147, pp. 78-80.

Under Florida law, the survivors of Gregory Edwards' Estate would be the wife and minor daughter.  §768.21(1 -3), Fla. Stat.  There is no provision whereby Ms. Rodriguez-Bonilla, Gregory Edwards' mother-in-law, would be deemed a survivor or beneficiary entitled to damages for herself.   See e.g. *Coates v. R.J. Reynolds Tobacco Co.*, __ So.3d __, 2023 WL 106899 at * 4 (Fla. January 5, 2023) (§768.21, Fla. Stat. identifies survivors who may recover under Florida's Wrongful Death Act); *Sharbaugh v. Beaudry*, 267 F.Supp.3d 1326, 1335-40 (N.D.Fla. 2017) (deciding that §768.21, Fla. Stat., "fills that gap" by providing a remedy under §1983, including defining survivors who may recover).

Thus, Ms. Rodriguez-Bonilla is not a beneficiary of the Estate and even if she was, there are others (the wife and daughter) and so pursuant to the decision in *Iriele* she may not proceed in this matter on a pro se basis.

4

**B. <u>There are creditors for the Estate.</u>**

There are at this point at least two creditors to the Estate. In this case, the Defendants were awarded a judgment against the Estate for taxable costs in the amount of $8,432.20. (Dkt. 190, copy attached hereto as Exhibit D.) Additionally, in the related action against the City of West Melbourne, Middle District of Florida Case No. 6:20-cv-02235-JA-DAB, the City has been awarded a cost judgment against the Estate for $3,575.96. (See Exhibit E to this response).[1]

Thus, the Estate now has at least those creditors and so, again per the rule announced in *Iriele* Ms. Rodriguez-Bonilla may not proceed on a pro se basis on behalf of the Estate.

<u>CONCLUSION</u>

Based on the further holding in *Iriele* that a district court may not simply dismiss a pro se case brought on behalf of an Estate in these circumstances, Appellees respectfully submit it would appear that the Court should provide the Estate "an opportunity to obtain counsel within a reasonable amount of time before dismissing the case outright." *Iriele* at * 4.

---

[1] The two cases, one against the Brevard Sheriff and corrections deputies, and the other, against the City of West Melbourne, were combined for purposes of discovery and pretrial matters. (See Dkts. 12, 46, and 42).

5

## <u>CERTIFICATE OF COMPLIANCE</u>

A Certificate of Compliance pursuant to Rule 32(g)(1) does not appear to be necessary when responding to a jurisdictional question.

<div align="right">

*s/ Thomas W. Poulton*

THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:   321-203-4304
Attorney for Defendants/Appellees
Ivey, Fayson, Zimmerman and
Wagner, Jr.

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of April 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice via electronic mail to counsel of record and I further certify that I served the foregoing via U.S. mail to the following non-CM/ECF participant: Margarita Rodriguez-Bonilla, 14410 Turin Lane, Centreville, VA 20121.

<div style="margin-left:40%">

*s/ Thomas W. Poulton*
THOMAS W. POULTON, ESQ.
Florida Bar No.: 0083798
*poulton@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida 32792
Telephone: 407-673-5000
Facsimile: 321-203-4304
Attorney for Defendants/Appellees
Ivey, Fayson, Zimmerman and
Wagner, Jr.

</div>

7

# EXHIBIT A

DEVON M. JACOB, ESQUIRE
PA Bar Number: 89182
JACOB LITIGATION, INC.
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Plaintiff's Counsel)

BENJAMIN L. CRUMP, ESQUIRE
FL Bar Number: 72583
BEN CRUMP LAW, PLLC
122 S. Calhoun Street, Tallahassee, Florida 32301
(850) 224-2023 | court@bencrump.com
(Plaintiff's Counsel)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA (Orlando)

MARGARITA RODRIGUEZ-BONILLA,
as the Successor Personal Representative of the
ESTATE OF GREGORY LLOYD EDWARDS,

                                **Plaintiff,**

    v.

WAYNE IVEY,
KELLY HAMAN,
GEORGE FAYSON,
RICHARD ZIMMERMAN,
ROBERT WAGNER, JR.,
FREDDY CEDENO,
ALLISON BLAZEWICZ,
DEBORA NADEAU,
AYANA ROBINSON,
YOLANDA JONES, and
ARMOR CORRECTIONAL HEALTH SERVICES, INC.,

                                **Defendants.**

No. 6:21-cv-428-JA-EJK

District Judge: John Antoon, II

CIVIL ACTION – LAW
JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT[1]

AND NOW comes the Plaintiff, MARGARITA RODRIGUEZ-BONILLA, as the

Successor Personal Representative of the ESTATE OF GREGORY LLOYD EDWARDS, by and

through her undersigned counsel, DEVON M. JACOB, ESQUIRE, and the law firm of JACOB

---

[1] Filed with written consent from opposing counsel pursuant to Fed.R.Civ.P. 15(a)(2).

1

LITIGATION, INC., and BENJAMIN L. CRUMP, ESQUIRE, and the law firm of BEN CRUMP

LAW, PLLC, and avers as follows:

### I.   JURISDICTION AND VENUE

1.   This action is brought pursuant to 42 U.S.C. § 1983.

2.   Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343, and 1367.

3.   Venue is proper in this Court, as the Defendants' actions that are alleged to have

caused injury to GREGORY LLOYD EDWARDS and/or his death, occurred in this federal

district.

### II.   CERTIFICATION OF COUNSEL

4.   Pursuant to Fla. Stat. Ann. § 766.104, undersigned counsel, Devon M. Jacob,

Esquire, hereby certifies that he made a reasonable investigation, as permitted by the

circumstances, for the purpose of determining that there were grounds for a good faith belief that

there has been negligence in the care and treatment of Plaintiff's decedent that caused the decedent

to pain and suffering and physical and emotional injury.

5.   That investigation gave rise to a good faith belief that grounds exist for an action

against each named defendant.

6.   In accordance with Fla. Stat. Ann. § 766.203(2), before filing the Complaint (Doc.

1), Plaintiff, MARGARITA RODRIGUEZ-BONILLA, with the assistance of her undersigned

counsel, investigated the claims, and sent DEBORA NADEAU, AYANA ROBINSON,

YOLANDA JONES, and ARMOR CORRECTIONAL HEALTH, INC., via certified Priority Mail

Express 2-Day delivery (certified delivered on December 7, 2020), a notice of intent to initiate

litigation, along with a corroborating opinion from a medical expert.

7.      The notice of intent and the corroborating expert opinion clearly discussed the manner in which the Defendants deviated from the standard of care, causing the decedent's medical condition to continue to deteriorate.

8.      In a letter dated January 6, 2021, Defense counsel advised undersigned counsel in relevant part, that "[t]hese failures include, but are not necessarily limited to, the lack of a corroborating expert opinion that satisfies the standards set forth in *Gooding v. University Hosp. Bldg., Inc.,* 445 So. 2d 1015 (Fla. 1984) and *Howell v. Balchunas* 284 So. 3d 1180 (Fla. Dist. Ct. App. 2019)."

9.      In an Email dated January 7, 2021, undersigned counsel requested "a clarification of the purported 'failures'" so that the issue could be remedied if necessary.

10.     In a letter dated January 13, 2021, however, after acknowledging receipt of the Email,  defense counsel merely repeated, without clarification, "the Affidavit submitted in support of the NOI does not comply with the requirements of Florida Statute Ch. 766.203(2) as discussed in *Gooding v. University Hosp. Bldg., Inc.,* 445 So. 2d 1015 (Fla. 1984) and *Howell v. Balchunas,* 284 So. 3d 1180 (Fla. Dist. Ct. App. 2019)."

11.     Regardless, the notice of intent and the corroborating expert opinion provided more than adequate information for the Defendants to evaluate the merits of the claims asserted.

12.     This is evidenced by the fact that the Defendants retained counsel; conducted their own investigation of the medical care provided; conducted written discovery on the claims that included Plaintiff responding to 34 Interrogatories and 27 document requests, and producing 625 pages of documents; Plaintiff executing a medical release so that Defendants could obtain copies of medical records from 5 medical facilities; and Plaintiff agreeing to present for questioning and to arrange for the Decedent's wife to present for questioning (which Defendants opted to forego).

13.     Furthermore, the Defendants retained Thomas D. Fowlkes, M.D., and served an expert report from Dr. Fowlkes, in which he stated that he had reviewed the Notice of Intent, the Affidavit from Plaintiff's expert, the original complaint in the instant matter, the autopsy report, jail security video, and numerous ARMOR policies and procedures. See Maldonado v. EMSA Ltd. Partnership, 645 So. 2d 86, 89 (Fla. Dist. Ct. App. 1994) ("Clearly, if defendant did not have sufficient information to evaluate the merits of the claim it would have been unable to provide a responding affidavit.")

14.     Notably, Dr. Fowlkes did not state in his report that he did not understand the Notice of Intent, the Affidavit from Plaintiff's expert, Plaintiff's medical negligence claims, or the medical injury that Plaintiff alleged resulted from same.

15.     To the contrary, Dr. Fowlkes stated, "I am knowledgeable and experienced in the issues raised by this Notice of Intent and the conditions Gregory Lloyd Edwards experienced and was treated for."

16.     Dr. Fowlkes opined in relevant part, "I disagree with the criticisms expressed in the Notice of Intent and corresponding affidavit and it is my opinion that the care and treatment provided to Gregory Lloyd Edwards by Armor Correctional Health Services, Inc., and its employees and/ or agents, did not fall below the applicable standard of care and nothing they did or did not do caused any injury to Gregory Lloyd Edwards."

17.     In a letter dated March 8, 2021 (rejecting the claim), defense counsel stated, "The care rendered to Gregory Edwards complied with the applicable standard of care and was not the cause of any alleged injury sustained. There are no reasonable grounds to conclude otherwise. In support, please find enclosed the affidavit and CV of Thomas D. Fowlkes, M.D."

18.    Defense counsel then repeated his comment, again without clarification, stating, "the lack of a corroborating expert opinion that satisfies the standards set forth in <u>Gooding v. University Hosp. Bldg., Inc.</u>, 445 So.2d 1015 (Fla. 1984) and <u>Howell v. Balchunas</u>, 284 So.3d 1180 (Fla. Dist. Ct. App. 2019)."

## III. IDENTIFICATION OF PARTIES AND MATERIAL WITNESSES

19.    The Decedent is GREGORY LLOYD EDWARDS ("EDWARDS"), an adult, who died on December 10, 2018, at the age of 38, in Brevard County, Florida. EDWARDS is survived by his wife, Kathleen P. Edwards, and a minor child, KPE.

20.    Plaintiff, MARGARITA RODRIGUEZ-BONILLA ("BONILLA"), is an adult, who is domiciled in the Commonwealth of Virginia. On October 23, 2020, the Probate Division of the Circuit Court of the 18th Judicial Circuit in and for Brevard County, Florida, issued Amended Letters of Administration, appointing BONILLA, Successor Personal Representative of the Estate of the ESTATE OF GREGORY LLOYD EDWARDS ("ESTATE"). BONILLA asserts claim on behalf of the ESTATE and BENEFICIARIES as permitted by law.

21.    Defendant, WAYNE IVEY ("IVEY"), is an adult, who during all relevant times, was employed by Brevard County, as the Sheriff. IVEY is the policymaker for the BREVARD COUNTY SHERIFF'S OFFICE ("SHERIFF'S OFFICE"), which is located at 700 S. Park Avenue, Titusville, FL 32780. The SHERIFF'S OFFICE operates the Brevard County Jail Complex, located at 860 Camp Road, Cocoa, FL 32927. IVEY (hereinafter "IVEY" or "SHERIFF'S OFFICE") is sued in his official capacity only.

22.    Defendant, KELLEY HAMAN ("HAMAN"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy, with the rank of Major. HAMAN is sued in her individual capacity.

23.     Defendant, GEORGE FAYSON ("FAYSON"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy, with the rank of Lieutenant. FAYSON is sued in his individual capacity.

24.     Defendant, RICHARD ZIMMERMAN ("ZIMMERMAN"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy, with the rank of Sergeant. ZIMMERMAN is sued in his individual capacity.

25.     Defendant, ROBERT WAGNER, JR. ("WAGNER"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy and a Field Training Officer ("FTO"). WAGNER is sued in his individual capacity.

26.     Defendant, FREDDY CEDENO ("CEDENO"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Corrections Deputy. CEDENO is sued in his individual capacity.

27.     Defendant, ALLISON BLAZEWICZ ("BLAZEWICZ"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Corrections Deputy. BLAZEWICZ is sued in her individual capacity.

28.     Defendant, DEBORA NADEAU ("NADEAU"), is an adult, who during all relevant times, was employed by, or an agent of, Armor Correctional Health Service, Inc., and/or Brevard County Sheriff's Office, as a licensed practical nurse. NADEAU is sued in her individual capacity.

29.     Defendant, AYANA ROBINSON ("ROBINSON"), is an adult, who during all relevant times, was employed by, or an agent of, Armor Correctional Health Service, Inc., and/or Brevard County Sheriff's Office, as a licensed practical nurse. ROBINSON is sued in her individual capacity.

30.     Defendant, YOLANDA JONES ("JONES"), is an adult, who during all relevant times, was employed by, or an agent of, Armor Correctional Health Service, Inc., and/or Brevard County Sheriff's Office, as a licensed practical nurse. JONES is sued in her individual capacity.

31.     Defendant, ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("ARMOR"), is a for profit corporation with a principle address of 4960 SW 72nd Avenue, Suite 400, Miami, FL33155, registered with the Florida Department of State Division of Corporations. ARMOR'S registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

## IV. **MATERIAL FACTS**

32.     GREGORY LLOYD EDWARDS ("EDWARDS") was a military veteran who served as a combat medic.

33.     As a result of his military service, EDWARDS suffered from Post-Traumatic Stress Disorder ("PTSD").

### A. **Gregory Edwards Arrested: Mental Health: Determined to be Danger to Self and/or Others.**

34.     On Sunday, December 9, 2018, at approximately 11:15 AM, EDWARDS suffered a PTSD mental health emergency while in the parking lot of the Walmart Supercenter, 845 Palm Bay Road NE, West Melbourne, FL 32904, causing a disturbance.

35.     West Melbourne Police Officers responded to the location and placed EDWARDS under arrest for various criminal and probation related offenses.

36.     During their on-scene investigation, West Melbourne Police Officers were advised:

       a.     EDWARDS suffered from PTSD, was not taking his prescribed medications, had been acting strange for several days, and had not slept in four days.

7

b.    EDWARDS' was experiencing a "psychotic episode," and his wife was concerned that EDWARDS might harm himself.

c.    EDWARDS was scheduled for an appointment the next day with the VA Hospital.

37.    West Melbourne Police Officers determined that EDWARDS suffered from a mental illness, was presently a danger to himself and/or others, and required a mental health examination.

38.    As such, West Melbourne Police Officers prepared a Baker Act Form-52[2] for the purpose of obtaining an emergency involuntary examination for Edwards.

**B.    Gregory Edwards Taken to Jail Not Hospital: Jail Accepts Edwards.**

39.    A West Melbourne Police Officer transported EDWARDS to the Brevard County Jail Complex ("Jail").

40.    EDWARDS was not medically cleared before he was transported to the Jail.

41.    Sgt. RICHARD ZIMMERMAN ("ZIMMERMAN") and Field Training Officer ("FTO"), ROBERT WAGNER, JR. ("WAGNER") brought EDWARDS into the Jail and spoke with the transporting officer.

42.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER all information known to the West Melbourne Police Department regarding EDWARDS' medical condition;

---

[2] The Florida Mental Health Act of 1971, commonly known as the "Baker Act," authorizes among others, a law enforcement officer, to require an emergency involuntary institutionalization and examination of an individual.

b.      The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER all information known to the West Melbourne Police Department regarding the facts and circumstances that resulted in EDWARDS being taken into custody;

c.      The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS was suffering from a serious medical emergency requiring immediate medical treatment;

d.      The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS suffered from a mental illness;

e.      The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS was a danger to himself or others;

f.      The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS needed immediate emergency medical care authorized by the Baker Act.

43.      On Sundays, the Brevard County Jail Complex is not equipped or staffed to provide the immediate emergency medical care authorized by the Baker Act, and necessary to treat EDWARDS' serious medical condition.

44.      Despite knowing the aforementioned, corrections personnel agreed to take custody of EDWARDS.

45.      As a result, EDWARDS did not timely receive the emergency medical care authorized by the Baker Act, and necessary to treat his serious medical condition.

46.     As a further result, EDWARDS' already serious medical condition continued to deteriorate.

47.     The deliberate failure to provide EDWARDS with necessary and timely emergency medical care while EDWARDS was in custody was a substantial cause of EDWARDS' death.

48.     When EDWARDS arrived at the Jail, he appeared dazed and confused, but was compliant.

49.     EDWARDS changed into an orange Jail jumpsuit, and instead of being provided with necessary medical care, he was placed in holding cell 7, reportedly to calm down from the Walmart incident.

## C. Major Kelly Haman: Notified of Gregory Edwards' Physical and Mental Condition: Edwards Mental Health Deteriorates While He Is Ignored For Approximately 30 Minutes.

50.     Major KELLY HAMAN ("HAMAN") saw EDWARDS in cell 7, and upon inquiry to deputies, was informed that EDWARDS had been arrested after a use of force.

51.     For approximately 30 minutes, no one checked on EDWARDS.

52.     During that period of time, EDWARDS' mental status deteriorated.

53.     Specifically, on a security video, EDWARDS can be observed talking to himself, staring at the wall, and appearing to change between calm and irritated moods.

54.     FTO WAGNER entered the cell to provide EDWARDS with a bagged lunch, and observed EDWARDS' agitated state.

55.     EDWARDS engaged in various types of exercises, shadow boxing, throwing his lunch around, and pacing.

56.     EDWARDS became increasingly agitated, culminating in EDWARDS banging on the cell door window in an apparent attempt to gain the attention of deputies who had been ignoring him.

### D.  Cpl. Brian Otto and Edwards: Physical Altercation.

57.     Cpl. Brian Otto ("Otto") came to cell 7 to retrieve EDWARDS to continue with the Booking process, alone.

58.     Otto recognized that EDWARDS was not mentally well, as evidenced by his later statement to investigators that EDWARDS was "not processing" when he took him from the cell.

59.     While being escorted by Otto, EDWARDS shook his left arm in an apparent failed attempt to remove Otto's hand from his shoulder.

60.     EDWARDS made movements appearing to prepare to strike Otto but he did not do so.

61.     Apparently intending to take EDWARDS to the ground, Otto responded with a failed leg sweep.

62.     Otto ended up causing both EDWARDS and himself to fall to the ground.

63.     When he did so, Otto appeared to bang his head on the ground.

64.     On the way to the ground, EDWARDS appeared to throw a punch that did not connect.

65.     FTO WAGNER, apparently trying to tackle EDWARDS, ended up tripping over EDWARDS, providing EDWARDS with an opportunity to strike Otto twice in the back of his head.

11

### E. **Supervisors Arrive on Scene: Direct Excessive Force.**

66.     Sgt. ZIMMERMAN, apparently attempting to apply a wrist lock technique on EDWARDS, ended up instead causing Otto's head to become stuck under EDWARDS' arm.

67.     WAGNER punched EDWARDS with a closed fist several times in one of his legs and back, while Deputy Shannon Popielarczyk ("Popielarczyk") held EDWARDS' legs.

68.     Deputy FREDDY CEDENO ("CEDENO") took over Popielarczyk's position.

69.     Otto freed himself, pepper sprayed EDWARDS, and then deployed several hard strikes to EDWARDS' torso, before walking away.[3]

70.     Shift commander, Lt. GEORGE FAYSON ("FAYSON"), responded to the location, called for more deputies to respond, and then instead of supervising, delivered several knee strikes to one of EDWARDS' upper thighs.

71.     Due to the lack of skilled supervision, the incident devolved into a deputy pile-on of EDWARDS.

72.     At one point, approximately nine deputies, each vying for a place in the frenzied pack, proceeded to use force against EDWARDS.

73.     The mob excitement is apparent even on the silent security video where deputies can be seen trying to get in on the action.

74.     Based on the number of deputies engaged in the aggressive and uncoordinated use of force against EDWARDS, it was impossible for EDWARDS to comply with any request to move in any manner.

75.     Yet, the deputies continued to swarm around EDWARDS, crushing, twisting, and striking his body and extremities, until EDWARDS disappeared under the attacking mass.

---

[3] Notably, and inexcusably, Sheriff Ivey, the Major Crimes Unit, Staff Services Unit, and FDLE, all relay a version of the events that does not track the security video.

76.    Major HAMAN instructed Deputy ALLISON BLAZWICZ ("BLAZWICZ") to use her Model X26 Taser against EDWARDS, and authorized multiple deployments.

77.    BLAZWICZ fired her Taser into EDWARDS' lower back and then used the Taser in drive-stun mode against EDWARDS.

78.    The Taser log recorded 6 trigger pulls – a total activation time of 49 seconds – over just a 1 minute and 33 seconds period of time.

79.    Three of the trigger pulls were for 5 seconds, and three of the trigger pulls ranged from 10-13 seconds.

80.    ZIMMERMAN placed EDWARDS' head between his knees and applied a pressure point technique on EDWARDS.

81.    Dashawn Edward ("Edward") assisted in applying handcuffs to EDWARDS.

82.    Approximately five minutes into the use of force incident, EDWARDS was handcuffed to the rear.

**F.   Supervisors Orders: Restraint Chair and Spit-Mask: No Decontamination and No Medical Assessment: Falsified Armor Medical Records.**

83.    Lt. FAYSON directed that EDWARDS be secured in a restraint chair.

84.    Lt. FAYSON further directed that EDWARDS remain handcuffed to the rear while he was restrained in the restraint chair.

85.    Four deputies lifted a visibly limp-bodied (but alive) EDWARDS from the floor and placed him into the restraint chair.

86.    Despite EDWARDS' non-resistance, ZIMMERMAN held EDWARDS' head and applied a pressure point technique to EDWARDS while he was being restrained in the restraint chair.

87.     FTO WAGNER punched EDWARDS several times in the leg, claiming EDWARDS would not permit his leg to be restrained.

88.     It is likely that any perceived resistance to being further restrained was likely just a reflexive response to the unnecessary pressure point force techniques being applied.

89.     Up to seven deputies participate in restraining EDWARDS in the restraint chair while his arms were still handcuffed to the rear and the Taser barbs remain lodged in his lower back.

90.     Despite the fact that EDWARDS was no longer resisting, and was not spitting, Major HAMAN directed that a spit-mask be placed over EDWARDS' head.

91.     While Lt. FAYSON and Major HAMAN observed, Deputy CEDENO and ZIMMERMAN placed a spit-mask over EDWARDS' head without first decontaminating him from the pepper spray.

92.     All of the Defendants present should have understood that the prolonged Taser use, coupled with mechanical asphyxiation and physical assault, likely increased the lactic acid accumulating in EDWARDS' body.

93.     At the very least, the Defendants knew that EDWARDS required medical care but failed to provide it to him.

94.     Despite official reports indicating otherwise, at no time did a nurse check the restraint chair straps as required by policy to ensure that EDWARDS' breathing and circulation were not impaired.

95.     Despite having not performed an assessment, Nurse DEBORA NADEAU ("NADEAU") indicated in the medical record that EDWARDS' CMS (circulation, motion, and sensation) were intact, and that his respiratory status was unlabored.

14

96.     Nurse AYANA ROBINSON ("ROBINSON") indicated in the medical record that while EDWARDS was restrained in the restraint chair he was spitting.

97.     However, this was merely an assumption that Nurse ROBINSON had made from the fact that he was wearing a spit-mask.

98.     Both Nurses, YOLANDA JONES ("JONES") and ROBINSON, noted in the medical record that EDWARDS was disoriented and confused but then failed to perform a medical assessment of his medical condition.

### G. Wheeled Into Cell 9: Door Closed: Not Monitored: Allowed to Slowly Suffocate Alone.

99.     About 10 minutes after EDWARDS was restrained in the restraint chair, Deputy EDWARD wheeled EDWARDS into holding cell 9, and at 2:07 PM, closed the cell door.

100.    WAGNER has since admitted that while EDWARDS could be seen by people who were working in Booking, no supervisor assigned anyone to monitor EDWARDS while he was in cell 9.

101.    For the next 16 minutes, EDWARDS struggled and flexed against the restraints.

102.    Horrifically, EDWARDS visibly struggled to breathe – like a fish out of water – his mouth open and pressed against the spit-mask material.

103.    Deputies ignored EDWARDS while he struggled alone.

104.    EDWARDS' inability to breathe deeply and unrestricted likely further complicated the medical emergency that was developing.

105.    At 2:16 PM, Nurse NADEAU and FTO WAGNER peered into the cell through the cell door window for approximately seven seconds.

106.    NADEAU told investigators that she heard EDWARDS yelling.

107.     Despite knowing that EDWARDS had arrived at the facility in an agitated and combative state; had engaged in a significant physical altercation with numerous guards; had been subjected to the use of a Taser and pepper spray, and had not yet been decontaminated; was restrained in a restraint chair with his hands handcuffed behind him; had Taser barbs still in his back, and a spit-mask on his head; and had not had vital signs checked after the altercation, or his respiratory status assessed after being exposed to pepper spray; NADEAU, who was assigned to Booking, failed to initially assess Edwards or continually monitor his medical condition.

108.     Instead, NADEAU walked away, again leaving EDWARDS alone.

109.     Despite not assessing EDWARDS, NADEAU indicated in the medical records that EDWARDS was alert and oriented.

110.     EDWARDS' desperation and distress visibly increased.

111.     EDWARDS' moved his head to the side and back, his mouth continued to be open, and his legs pulled against the restraints.

112.     EDWARDS threw his head forward several times and his chest flexed.

113.     Six minutes after NADEAU walked away from the struggling EDWARDS, EDWARDS fell limp; except for periodic twitching.

**H.  Gregory Edwards: Unresponsive: Priority One: Remove Taser Barbs?: Wheeled to Medical Unit Instead of Transferred to Hospital.**

114.     At approximately 2:23 PM, after personnel finally discovered EDWARDS' new medical emergency, the cell door opened and personnel enter.

115.     Lt. FAYSON removed the spit-mask from EDWARDS and WAGNER administered a sternum rub, which yielded no response.

16

116.     Instead of providing EDWARDS with immediate necessary emergency medical care, deputies loosened the restraint chair straps and worked for several minutes to remove the Taser barbs from EDWARDS' back.

117.     It was not until 2:26 PM that NADEAU entered the cell and administered a sternum rub, which again yielded no response.

118.     This was the first time that NADEAU conducted any assessment of EDWARDS.

119.     Despite being unresponsive to painful stimuli, EDWARDS was left in the restraint chair and NADEAU administered oxygen with a non-rebreather mask.

120.     In the medical records, however, NADEAU failed to report her use of a sternal rub and EDWARDS' failure to respond to painful stimuli.

121.     Instead, NADEAU reported that EDWARDS was unresponsive, and that she applied an oxygen mask.

122.     She further reported that EDWARDS' chest was moving and he was blinking his eyes but that he was not responsive to verbal commands.

123.     Finally, she indicated that EDWARDS' oxygen saturation was 98% but failed to note that EDWARDS was being administered oxygen at 15L.

124.     Both Nurses, JONES and ROBINSON, similarly reported that they observed EDWARDS in the restraint chair, unresponsive, with an oxygen mask on his face, with shallow breathing.

125.     Instead of insisting that 911 be initiated immediately to have EDWARDS transferred to a hospital for necessary emergency medical care, NADEAU, JONES, and ROBINSON, permitted security officers to transport EDWARDS, unresponsive and still restrained in the restraint chair, with oxygen, to the medical unit for further evaluation by the charge nurse.

17

126.    EDWARDS was left in the restraint chair for 10 minutes before he was removed to be transported to medical.

127.    Due to the security doors in place on the path to the medical unit, it would have taken an estimated three to five minutes for EDWARDS to be transferred from Booking to the Medical Unit.

## I.  Heartrate Slows to a Stop, and Then Restarted: Hypoxic Brain Injury: Both Evidence of Suffocation.

128.    NADEAU failed to communicate to the charge nurse the entirety of her knowledge regarding what had transpired with EDWARDS between the time that he arrived at the facility and then arrived in the medical unit.

129.    Upon arrival in the medical unit, oxygen was being administered at 15L via a non-rebreather mask with EDWARDS having only very shallow breathing.

130.    The charge nurse performed a sternum rub with no response.

131.    Recognizing the dire situation, the charge nurse immediately advised a Sergeant to call 911.

132.    JONES reported that EDWARDS' breathing was shallower when he arrived in medical than when he left Booking.

133.    Shortly after arriving in the Medical Unit, EDWARDS went into respiratory arrest.

134.    EDWARDS was removed from the restraint chair and placed on a backboard.

135.    At 2:38 PM, CPR was initiated.

136.    At 2:49 PM, Brevard County Fire Rescue EMS arrived and took over medical care.

137.    Once EMS arrived and took over care, the charge nurse called NADEAU in Booking to gather more information on EDWARDS.

138.    NADEAU reported that Edwards was "fine" when he left Booking.

18

139.    In the event that that were true, the oxygen administration should not have been set at 15L, as oxygen toxicity (oxygen poisoning) could result, which could in turn cause respiratory depression, respiratory arrest, and in severe cases, death.

140.    In the alternative, if EDWARDS' medical condition when he left Booking was such that 15L of oxygen was appropriate, 911 should have been initiated and EDWARDS should have been immediately transferred from Booking to a hospital for emergency medical treatment.

141.    Approximately 20 minutes later, EDWARDS was removed from the Jail to be transferred to the Rockledge Regional Medical Center.

142.    EDWARDS' breathing and heart slowed to a stop.

143.    Prior to his arrival at the hospital, however, EDWARDS' pulse returned.

144.    EDWARDS arrived at the hospital with a hypoxic brain injury.

145.    EDWARDS was placed on life support.

146.    On December 10, 2018, at 8:00 PM, EDWARDS was pronounced dead.

147.    While the Defendants failed to monitor EDWARDS, he suffocated very slowly and painfully, and for much of the time, was conscious and believed that he was going to die.

148.    The Defendants, however, claim that EDWARDS died from Excited Delirium Syndrome, not from the 16 minutes of terrifying suffocation.

### J.   Crime Scene Not Secured: Material Evidence in Death Investigation – Spit-Mask – Discarded.

149.    Despite being the law enforcement agency initially responsible for conducting the death investigation, the Sheriff Defendants failed to secure the crime scene.

150.    In addition, WAGNER directed an inmate to clean cell 9.

151.    Before doing so, HAMAN, FAYSON, ZIMMERMAN, and/or WAGNER never had the crime scene processed in accordance with standard investigation techniques in the industry.

19

152.    The inmate who cleaned cell 9 discarded the spit-mask that was used on EDWARDS.

153.    As a result, the condition of the spit-mask, i.e., the breathability of the material, whether the material was covered with body fluids, etc., could not be assessed.

**K.  Sheriff WAYNE IVEY: Deficient Policies and Training.**

154.    Sheriff WAYNE IVEY ("IVEY") is the duly elected Sheriff of Brevard County.

155.    IVEY is the final policymaker for the BREVARD COUNTY SHERIFF'S OFFICE ("SHERIFF'S OFFICE") and the Jail.

156.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    IVEY knowingly failed to implement supervisor policies and/or training for the jail that met the industry standard.

b.    IVEY knowingly failed to implement intake and booking policies and/or training that met the industry standard.

c.    IVEY knowingly failed to implement medical screening policies and/or training that met the industry standard.

d.    IVEY knowingly failed to implement mental health and Baker Act policies and/or training that met the industry standard.

e.    IVEY permitted the use of pepper spray, electronic control weapons, restraint chairs, and spit-masks, without first verifying the safety of each devices, or the safety of the use of the devices in combination.

f.     IVEY permitted the use of pepper spray, electronic control weapons, restraint chairs, and spit-masks, in the Jail but failed to first implement policies and/or training that met the industry standard to insure the health and safety of inmates and to protect inmates' rights.

g.     IVEY knowingly failed to implement inmate monitoring policies and/or training that met the industry standard.

h.     IVEY knowingly failed to implement medical policies and/or training that met the industry standard to ensure that inmates received timely emergency medical care.

i.     IVEY knowingly failed to implement internal affairs policies and/or training that met the industry standard to ensure that policy, training, or operational deficiencies are timely discovered and corrected.

j.     IVEY knowingly failed to implement independent death investigation policies and/or training that met the industry standard to ensure that policy, training, or operational deficiencies are timely discovered and corrected.

k.     IVEY knowingly created a non-transparent culture that in addition to creating public distrust, resulted in policy, training, and operational deficiencies not being timely discovered and corrected.

157.   NADEAU admits that she never assessed EDWARDS because of an unwritten "rule" of ARMOR and/or IVEY that she was not to assess inmates until deputies told her that it was safe for her to come out of her office to do so.

158.   NADEAU advised that no deputy ever told her that it was safe to assess EDWARDS.

159.   On May 15, 2019, FAYSON submitted a notice of retirement to be effective June 3, 2019, a date prior to the completion of the administrative investigation.

**L. Armor Correctional Health Services, Inc.: Policy, Practice and Custom of Deliberate Indifference to Health and Safety of Inmates.**

160.   ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("ARMOR") is a for profit corporation.

161.   The BSO and ARMOR entered into a contract whereby ARMOR would provide healthcare services to inmates housed at the Jail.

162.   Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.   Dr. Jose J. Armas is the founder and president of ARMOR, and a policymaker of ARMOR.

b.   During the relevant period of time, Dr. Jorge Gillette was the sole physician overseeing the provision of medical care at the Jail on behalf of ARMOR and IVEY, and as such, was a policymaker of ARMOR.

c.   Prior to and through the date of EDWARDS' death, ARMOR with the knowledge and consent of its policymakers, had a policy, practice, and/or widespread custom, of providing deficient medical care for the purpose of increasing corporate profits.

d.   Prior to EDWARDS' death, ARMOR had at least a decade long history that included approximately 34 lawsuits alleging that ARMOR had contributed to causing deaths through deficient medical care in numerous facilities in which ARMOR provided medical care.[4]

---

[4] https://www.miaminewtimes.com/news/jail-health-care-company-armor-correctional-accused-of-multiple-inmate-deaths-11268351

e.     ARMOR paid significant sums of money to settle legal claims alleging deficient medical care resulting in injury and/or death, which indicates that ARMOR believed that there was at least some evidence to support the claims.

f.     ARMOR had contracts not renewed or cancelled due to its failure to meet contractual obligations related to the provision of medical care.

g.     ARMOR has been the subject of government investigations and criminal charges related to the provision of deficient medical care.

h.     On or about February 11, 2011, William Campbell died of sepsis in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

i.     On or about October 10, 2011, Gary Joseph Smith died of pneumonia in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

j.     On or about January 2, 2012, Calvin Goldsmith died of sepsis in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

k.     Around May 2012, Allen Daniel Hicks, Sr., suffered a stroke, became comatose, and died while in the custody of the Hillsborough County Sheriff's Office at a facility where ARMOR provided health services, and that death was preventable.

l.     On or about July 7, 2012, Arthur Sacco died of sepsis in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

m.      On or about July 10, 2012, Raleigh Priester died of starvation in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

n.      On or about December 24, 2012, William Herring, Jr., died of starvation in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

o.      On or about January 7, 2015, Simon Valacheryil died of a gastrointestinal bleed and infectious pericarditis in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

p.      On or about May 7, 2015, Daniel K. Davies was relegated to a vegetative and/or comatose and/or brain-damaged state in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that/those severe medical conditions were preventable.

q.      On or about April 1, 2016, Scott Burrell died of peritonitis in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

r.      On or about April 5, 2016, Stephen Obremski died of a gastrointestinal hemorrhage in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

s.      On or about May 16, 2016, April Farrah died of a gastrointestinal hemorrhage in the Broward County Jail in Florida, a facility at which ARMOR provided health services, and that death was preventable.

t.      On or about July 31, 2013, David Moore was in the Sarasota County Jail, which was serviced by ARMOR, and suffered a traumatic brain injury and was denied access to necessary medical care.

u.      On or about December 25, 2014, Amanda Whidden, a detainee in the Manatee County Jail, serviced by ARMOR, had complications from withdrawal and was denied access to necessary medical care.

v.      In or around April 2014, Christopher Datta was a detainee in the Sarasota County Jail, which was serviced by ARMOR, and was denied access to necessary medical care.

w.      In or about April 2016, nurses employed by ARMOR demonstrated a pattern of intentionally falsifying health care records within the course and scope of their employment, and ARMOR was subsequently criminally charged. See State of Wisconsin v. Armor Correctional Health Services, Inc., 2018-ML-4041, Milwaukee County, Wisconsin, Circuit Court.

x.      On or about July 11, 2016, the State of New York, by and through its Attorney General, Eric T. Schneiderman, Esquire, filed a verified petition in the Supreme Court for the County of New York against ARMOR. See The People of the State of New York v. Armor Correctional Health Medical Services of New York, Inc., P.C., et. al., Index No. 450835/2016, New York County, New York, Supreme Court. The verified petition states that between 2011 and July of 2016, a total of 14 deaths occurred at Nassau and Niagara counties jails serviced by ARMOR, and the New York State Commission of Correction's Medical Review Board, which was charged with the oversight of jail and prison health care and the investigation of related morbidity and mortality incidents, "found egregious lapses in medical care in seven of the 14 deaths." It further states that the New York Attorney General's own investigation revealed that ARMOR had not met its contractual obligations to Nassau County, New York, had inadequate

25

self-assessments or self-audits, inadequate continuous quality improvement processes, inadequate diagnostic services, inadequate referrals to specialists, inadequate staffing, and failure to maintain its equipment and accurate and complete medical records.

y.    Through the aforementioned complaints and incidents, all prior to EDWARDS' death, ARMOR was on notice that it failed to provide medical intake, medical assessments, mental health services, physician involvement, and hospital referrals, in accordance with industry standards, resulting in injuries and/or death.

z.    Despite this notice, ARMOR never corrected the aforementioned deficiencies.

aa.    Prior to EDWARDS' death, Armas and Gillette were on notice that ARMOR'S policy, practice, and/or custom of failing to provide medical intake, medical assessments, mental health services, physician involvement, and hospital referrals, in accordance with industry standards, was occurring at the Jail.

bb.    Despite this notice, ARMOR, Armas, and Gillette, never corrected the aforementioned deficiencies.

cc.    The aforementioned deficiencies were a proximate cause of EDWARDS' untimely death in that NADEAU, ROBINSON, and JONES' conduct was in accordance with, and a direct result of, these deficiencies.

## V.    **CLAIMS**

### **Count I**

**Plaintiff v. Defendants, Haman, Fayson,
Wagner, Zimmerman, Cedeno, Blazewicz, Nadeau, Robinson, and Jones
Objectively Unreasonable Force**
*Fourteenth Amendment – Due Process (Pursuant to 42 U.S.C. § 1983)*

163.    Paragraphs 1 to 162 are incorporated herein by reference.

26

164.    EDWARDS was a pretrial detainee.

165.    All Defendants named herein were state actors.

166.    A pretrial detainee's Fourteenth Amendment excessive-force claim is governed by a rule of "objective reasonableness." Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015) ("[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."); Piazza v. Jefferson Cty., 923 F.3d 947, 951 (11th Cir. 2019).

167.    The Defendants used the following objectively unreasonable uses of force either individually or collectively:

a.    Permitted more persons than necessary to simultaneously use uncoordinated force against EDWARDS;

b.    Used or permitted uses of force that did not comply with training;

c.    Used or permitted excessive use of an electronic control weapon on EDWARDS;

d.    Authorized or placed EDWARDS in a restraint chair while his hands were still handcuffed to the rear;

e.    Failed to decontaminate EDWARDS after exposing him to pepper spray;

f.    Authorized or placed a spit-mask over EDWARDS' head without first decontaminating him from pepper spray;

g.    Left EDWARDS restrained with a spit-mask on his head, while he suffered from a medical emergency;

h.    Caused or permitted EDWARDS to slowly suffocate and suffer for in excess of 16 minutes, until he was rendered unconscious;

    i.    Authorized or failed to remove EDWARDS from restraints while he suffered from a medical emergency.

168.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

### Count II

**Plaintiff v. Defendants, Haman, Fayson,
Wagner, Zimmerman, Cedeno, Blazewicz, Nadeau, Robinson, and Jones
Deliberate Indifference to Serious Medical Needs
*Fourteenth Amendment – Due Process (Pursuant to 42 U.S.C. § 1983)***

169.    Paragraphs 1 to 162 are incorporated herein by reference.

170.    EDWARDS was a pretrial detainee.

171.    All Defendants named herein were state actors.

172.    In order to prove deliberate indifference to a serious medical need, a Plaintiff must demonstrate (1) a government official's subjective knowledge of a risk of serious harm; (2) the government official's disregard of the risk; (3) by conduct that is more than mere negligence. See Nam Dang, by and through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1280 (11th Cir. 2017).

173.    Deliberate indifference may be established by a failure to provide medical care and/or by excessive delay in providing medical care. Lelieve v. Chief of Police Manuel Oroso, 846 F.Supp.2d 1294, 1304 (S.D. Fla. Feb. 14, 2012).

174.    Each Defendant understood that EDWARDS suffered from a mental illness and was a danger to himself or others.

175.    Each Defendant knew that EDWARDS needed immediate emergency medical care but deliberately failed to provide EDWARDS with access to the requisite care.

176.    Each Defendant knew that EDWARDS had not received a medical assessment.

177.    Despite knowing that EDWARDS had arrived at the facility in an agitated and combative state; had engaged in a significant physical altercation with numerous guards; had been subjected to the use of a Taser and pepper spray, and had not yet been decontaminated; was restrained in a restraint chair with his hands handcuffed behind him; had Taser barbs still in his back, and a spit-mask on his head; and had not had vital signs checked after the altercation, or his respiratory status assessed after being exposed to pepper spray; the Defendants failed to continually monitor his medical condition.

178.    The Defendants failed to timely transfer EDWARDS to a hospital for emergency medical care.

179.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

## Count III

### Plaintiff v. Defendants Fayson, Haman, Zimmerman, and Wagner
### *Fourteenth Amendment – Supervisory Liability (Pursuant to 42 U.S.C. § 1983)*

180.    Paragraphs 1 to 162 are incorporated herein by reference.

181.    EDWARDS was a pretrial detainee.

182.    All Defendants named herein were state actors.

183.    "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

184.    Haman, Fayson, Zimmerman, and Wagner, were supervisors.

185.    Haman, Fayson, Zimmerman, and Wagner, personally participated in causing EDWARDS' constitutional injuries.

186.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

## Count IV

### Plaintiff v. Defendants, Haman, Fayson,
### Wagner, Zimmerman, Cedeno, Blazewicz, Nadeau, Robinson, and Jones
### *Fourteenth Amendment – Duty to Intervene (Pursuant to 42 U.S.C. § 1983)*

187.    Paragraphs 1 to 162 are incorporated herein by reference.

188.    EDWARDS was a pretrial detainee.

189.    All Defendants named herein were state actors.

190.    To establish a failure to intervene claim, a Plaintiff must establish that a Defendant officer was in a position to intervene to stop another officer's unlawful conduct and had an appreciable opportunity to do so. See Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996)

191.    The Defendants each had an appreciable opportunity and duty to intervene to stop each other's unlawful conduct but failed to do so.

192.    The Defendants each had an appreciable opportunity and duty to intervene on EDWARDS' behalf to ensure his physical and medical safety but failed to do so.

193.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

## Count V

### Plaintiff v. Defendants, Ivey (Official Capacity) and Armor
### Policies, Practices, and Customs
### *Fourteenth Amendment – Monell (Pursuant to 42 U.S.C. § 1983)*

194.    Paragraphs 1 to 162 are incorporated herein by reference.

195.    EDWARDS was a pretrial detainee.

196.    All Defendants named herein were state actors.

197.     The Defendants deliberately implemented or failed to implement policies and practices as discussed above, which was the moving force that caused EDWARDS' constitutional injuries.

198.     As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

### Count VI

**Plaintiff v. Individual Sheriff's Office Defendants (Individual Capacities)
Willful and Wanton Negligence Causing Injury and/or Death
*(Pursuant to Fla. Stat. § 768.28; Florida's Survival Act, Fla. Stat. § 46.021;
and Florida's Wrongful Death Act, Fla. Stat. §§ 768.16, et seq.)***

199.     Paragraphs 1 to 162 are incorporated herein by reference.

200.     All statutory prerequisites were timely and properly completed prior to the filing of this claim.

201.     EDWARDS was a pretrial detainee in the care, custody, or control of the Individual Sheriff's Office Defendants.

202.     Each Defendant either directly or indirectly owed EDWARDS a duty to exercise reasonable care in safeguarding EDWARDS while he was in the custody of the SHERIFF'S OFFICE and Jail, and to refrain from acting in a manner exhibiting wanton and/or willful disregard for EDWARDS' human rights and/or safety. See Fla. Stat. § 768.28(9)(a).

203.     As specifically discussed above, the Defendants each breached this duty by wantonly and/or willfully disregarding EDWARDS' human rights and/or safety.

204.     As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, and suffering.

205.    Pursuant to Florida's Survival Act, Fla. Stat. § 46.021, Plaintiff seeks damages on behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, for all harm and injuries suffered by EDWARDS that did not directly cause his death.

206.    In addition to, or in the alternative, as a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, suffering, and death.

207.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARD'S wife, minor child, and survivors, suffered emotional and financial injuries.

208.    No other legal action has been initiated on behalf of EDWARDS' survivors related to the conducted discussed herein.

209.    On behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, Plaintiff seeks all available damages as provided by Florida's Wrongful Death Act. See Fla. Stat. §§ 768.21; 768.0415.

## Count VII

### Plaintiff v. Defendant Ivey (Official Capacity)
### Negligence Causing Injury and/or Death
### *(Pursuant to Fla. Stat. § 768.28; Florida's Survival Act, Fla. Stat. § 46.021; and Florida's Wrongful Death Act, Fla. Stat. §§ 768.16, et seq.)*

210.    Paragraphs 1 to 162 are incorporated herein by reference.

211.    All statutory prerequisites were timely and properly completed prior to the filing of this claim.

212.    EDWARDS was a pretrial detainee in the care, custody, or control of the Individual Sheriff's Office Defendants.

213.    Each Individual Sheriff's Office Defendant either directly or indirectly owed EDWARDS a duty to exercise reasonable care in safeguarding EDWARDS while he was in the custody of the SHERIFF'S OFFICE and Jail. See Fla. Stat. § 768.28(9)(a).

214.    As specifically discussed above, the Defendants each breached this duty.

215.    IVEY, in his official capacity as the policymaker of the SHERIFF'S OFFICE, bears legal responsibility for the negligent conduct, acts, and omissions of their agents and employees. See Fla. Stat. § 768.28(9).

216.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, and suffering.

217.    Pursuant to Florida's Survival Act, Fla. Stat. § 46.021, Plaintiff seeks damages on behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, for all harm and injuries suffered by EDWARDS that did not directly cause his death.

218.    In addition to, or in the alternative, as a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, suffering, and death.

219.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARD'S wife, minor child, and survivors, suffered emotional and financial injuries.

220.    No other legal action has been initiated on behalf of EDWARDS' survivors related to the conducted discussed herein.

221.    On behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, Plaintiff seeks all available damages as provided by Florida's Wrongful Death Act. See Fla. Stat. §§ 768.21; 768.0415.

## Count VIII

**Plaintiff v. Defendants Nadeau, Robinson, and Jones**
**Medical Malpractice by Licensed Practical Nurses Causing Injury and/or Death**
*(Pursuant to Fla. Stat. § 766.102; Florida's Survival Act, Fla. Stat. § 46.021;*
*and Florida's Wrongful Death Act, Fla. Stat. §§ 768.16, et seq.)*

222.    Paragraphs 1 to 162 are incorporated herein by reference.

223.    All statutory prerequisites were timely and properly completed prior to the filing of this claim.

224.    NADEAU, ROBINSON, and JONES, were employed by, or an agent of, ARMOR and/or IVEY, as licensed practical nurses.

225.    EDWARDS was a pretrial detainee in the medical care of NADEAU, ROBINSON, and JONES.

226.    NADEAU, ROBINSON, and JONES were operating in the course and scope of their employment in furtherance of ARMOR'S interests.

227.    NADEAU, ROBINSON, and JONES' aforementioned actions represent a breach of the prevailing professional standard of care for licensed practical nurses.

228.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, and suffering.

229.    Pursuant to Florida's Survival Act, Fla. Stat. § 46.021, Plaintiff seeks damages on behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, for all harm and injuries suffered by EDWARDS that did not directly cause his death.

230.    In addition to, or in the alternative, as a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, suffering, and death.

231.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARD'S wife, minor child, and survivors, suffered emotional and financial injuries.

232.    No other legal action has been initiated on behalf of EDWARDS' survivors related to the conducted discussed herein.

233.    On behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, Plaintiff seeks all available damages as provided by Florida's Wrongful Death Act. See Fla. Stat. §§ 768.21; 768.0415.

## Count IX

### Plaintiff v. Defendant Armor
### *Medical Malpractice by Healthcare Provider Causing Injury and/or Death*
### *(Pursuant to Fla. Stat. § 766.110; Florida's Survival Act, Fla. Stat. § 46.021;*
### *and Florida's Wrongful Death Act, Fla. Stat. §§ 768.16, et seq.)*

234.    Paragraphs 1 to 162 are incorporated herein by reference.

235.    All statutory prerequisites were timely and properly completed prior to the filing of this claim.

236.    ARMOR had a duty to assure comprehensive risk management and the competence of its medical staff and personnel through careful selection and review.

237.    ARMOR had a duty to adopt written procedures for the selection of staff members and a periodic review of the medical care and treatment rendered to patients by each member of the medical staff;

238.    ARMOR had a duty to adopt a comprehensive risk management program which fully complies with the law.

239.    ARMOR had a duty to diligently administer the medical review and risk management processes, including the supervision of the medical staff and personnel to the extent

necessary to ensure that such medical review and risk management processes are being diligently carried out.

240.   Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

    a.   ARMOR breached the aforementioned duties.

241.   As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, and suffering.

242.   Pursuant to Florida's Survival Act, Fla. Stat. § 46.021, Plaintiff seeks damages on behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, for all harm and injuries suffered by EDWARDS that did not directly cause his death.

243.   In addition to, or in the alternative, as a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, suffering, and death.

244.   As a direct and proximate cause of the Defendants' aforementioned actions, EDWARD'S wife, minor child, and survivors, suffered emotional and financial injuries.

245.   No other legal action has been initiated on behalf of EDWARDS' survivors related to the conducted discussed herein.

246.   On behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, Plaintiff seeks all available damages as provided by Florida's Wrongful Death Act. See Fla. Stat. §§ 768.21; 768.0415.

## Count X

### Plaintiff v. Defendant Armor
### Vicarious Liability
### *(Pursuant to Florida State Law)*

247.    Paragraphs 1 to 162 are incorporated herein by reference.

248.    All statutory prerequisites were timely and properly completed prior to the filing of this claim.

249.    NADEAU, ROBINSON, and JONES, were employed by, or an agent of, ARMOR and/or IVEY, as licensed practical nurses.

250.    EDWARDS was a pretrial detainee in the medical care of NADEAU, ROBINSON, and JONES.

251.    NADEAU, ROBINSON, and JONES were operating in the course and scope of their employment in furtherance of ARMOR'S interests.

252.    NADEAU, ROBINSON, and JONES' aforementioned actions represent a breach of the prevailing professional standard of care for licensed practical nurses.

253.    ARMOR is vicariously liable for the actions of its agents and employees who cause injury to others while acting in the course and scope of their employment.

254.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, and suffering.

255.    Pursuant to Florida's Survival Act, Fla. Stat. § 46.021, Plaintiff seeks damages on behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, for all harm and injuries suffered by EDWARDS that did not directly cause his death.

256.    In addition to, or in the alternative, as a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, pain, suffering, and death.

257.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARD'S wife, minor child, and survivors, suffered emotional and financial injuries.

258.    No other legal action has been initiated on behalf of EDWARDS' survivors related to the conducted discussed herein.

259.    On behalf of the ESTATE OF GREGORY LLOYD EDWARDS, EDWARD'S wife, minor child, and survivors, Plaintiff seeks all available damages as provided by Florida's Wrongful Death Act. See Fla. Stat. §§ 768.21; 768.0415.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor as follows:

A.    Declaratory Judgment: That this Court declare that the Defendants' actions violated EDWARDS' state and federal rights;

B.    Compensatory Damages: all damages available by state and federal law, including but not limited to violation of rights, conscious physical pain and suffering, embarrassment, humiliation, fear, death, loss of enjoyment of life, hedonic damages, and the loss of companionship from family;

C.    Punitive Damages: as permitted by state and federal law;

D.    Reasonable attorney's fees and costs: as permitted by state and federal law;

E.    Pre and Post Judgment Interest: as permitted by state and federal law;

F.    Such other financial or equitable relief as is reasonable and just.

## Jury Trial Demand

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

**s/ *Devon M. Jacob***                        **Date: May 26, 2021**
**DEVON M. JACOB, ESQUIRE**
PA Bar No. 89182
**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Plaintiff's Counsel)

**s/ *Benjamin L. Crump***                     **Date: May 26, 2021**
**BENJAMIN L. CRUMP, ESQUIRE**
FL Bar No. 72583
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, Florida 32301
(850) 224-2023 | Court@bencrump.com
(Plaintiff's Counsel)

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA (Orlando)**

| | |
|---|---|
| **MARGARITA RODRIGUEZ-BONILLA,**<br>**as the Successor Personal Representative of the**<br>**ESTATE OF GREGORY LLOYD EDWARDS,** | **No. 6:21-cv-428-JA-EJK** |
| **Plaintiff,** | **District Judge: John Antoon, II** |
| **v.** | **CIVIL ACTION – LAW**<br>**JURY TRIAL DEMANDED** |
| **WAYNE IVEY, et al.,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I, Devon M. Jacob, Esquire, hereby certify that on the below referenced date, I caused a true and correct copy of this document to be served, via ECF, on all counsel of record.

**Respectfully Submitted,**

**s/ *Devon M. Jacob***                                                    **Date: May 26, 2021**
**DEVON M. JACOB, ESQUIRE**

40

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA (Orlando)**

MARGARITA RODRIGUEZ-BONILLA,     : No. 6:21-cv-0428-JA-EJK
as the Successor Personal Representative of the  :
ESTATE OF GREGORY LLOYD EDWARDS, :

                               :

               **Plaintiff,**         :

                               :

       **v.**                       :

                               :

**WAYNE IVEY, et al.,**          : **CIVIL ACTION – LAW**

                               :

               **Defendants.**      :

## PLAINTIFF'S INITIAL DISCLOSURES

AND NOW comes the Plaintiff, MARGARITA RODRIGUEZ-BONILLA, as the Successor Personal Representative of the ESTATE OF GREGORY LLOYD EDWARDS, by and through her undersigned counsel, DEVON M. JACOB, ESQUIRE, and the law firm of JACOB LITIGATION, INC., and BENJAMIN L. CRUMP, ESQUIRE, and the law firm of BEN CRUMP LAW, PLLC, pursuant to FED.R.CIV.P. 26(a) to provide the following Initial Disclosures. Plaintiff reserves the right to supplement or correct these disclosures in accordance with Rule 26(e). Plaintiff does not admit or concede the admissibility or the authenticity of any information identified below, and reserves all rights to object during discovery or at trial, including but not limited to the Plaintiff's right to invoke the attorney-client privilege, the work product doctrine, or other applicable privileges.

**A.    Pursuant to FED.R.CIV.P. 26(a)(1)(A)(i), Plaintiff provides "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment":**

It is believed that the following witnesses will testify regarding liability and damages, and should be contacted through Plaintiff's counsel:

**Witness:** Margarita Rodriguez-Bonilla (Gregory Edward's Mother-In-Law/Plaintiff).
**Witness:** ▊▊▊▊▊▊ Edwards (Gregory Edward's Minor Child)
**Witness:** Kathrine P. Edwards (Gregory Edward's Wife)
**Witness:** Cleda Douglas Edwards (Gregory Edward's Mother)
**Witness:** Peter Douglas (Gregory Edward's Brother)

**Witness:** Ronald J. Conte, Esquire; The Law Office of Ronald J. Conte (Estate Lawyer).

**Entity Witness:** City of West Melbourne, Florida, 2240 Minton Road, West Melbourne, Florida, 32904. The following witnesses are expected to testify regarding the incidents discussed in the First Amended Complaint, regarding liability, damages, and defenses.

**Witness:** Michael Perez (Police Officer/Defendant)
**Witness:** Jacob Mathis (Police Officer/Defendant)
**Witness:** Kevin Krukowski (Police Officer/Defendant)

**Entity Witness:** Walmart Supercenter, 845 Palm Bay Road NE, West Melbourne, FL 32904. It is believed that Walmart Supercenter possesses information, documents, and recordings regarding the incidents discussed in the First Amended Complaint.

**Entity Witness:** Brevard County Fire Rescue - Fire Station #83, 5148 Minton Road, Palm Bay, FL 32907. The following present/former employees are expected to testify regarding the medical response/treatment at Walmart.

**Witness:** Laura Clarisse (EMT Trainee)
**Witness:** Carlos James lriban (Fire Fighter EMT)
**Witness:** Jonathan Weiss (Medic)

**Entity Witness:** Brevard County Fire Rescue - Fire Station #29, 3950 Canaveral Groves Blvd., Cocoa, FL 32926. The following present/former employees are expected to testify regarding the medical response/treatment at the jail.

**Witness:** Brian Curits Sherbrook (Lieutenant)
**Witness:** Corbin Smith (Fire Fighter EMT)
**Witness:** George Thomas Ricks (Fire Fighter EMT)
**Witness:** Steve A. Hughes (Fire Fighter EMT)
**Witness:** Jason Webster (Lead)

**Entity Witness:** Armor Correctional Health, Inc., 4960 SW 72ND Avenue, Suite 400, Miami, FL, 33155-5550. The following present/former employees are expected to testify regarding the mental health services available at the Brevard County Jail Complex and/or Gregory Edwards' mental and physical health upon arrival at the facility:

> **Witness:** Debora Nadeau (Nurse)
> **Witness:** Ayana Robinson (Nurse)
> **Witness:** Yolanda Jones (Nurse)
> **Witness:** Ashley N. Taylor (formerly, Fried) (Nurse)
>       815 Carlyle Avenue SE
>       Palm Bay, FL 32909
>       (614) 625-9644
> **Witness:** Ashley Walker (Director of Nursing)
> **Witness:** Jorge Gillette (Physician)
> **Witness:** Jose J. Armas (Physician)

**Entity Witness:** Brevard Sheriff Office, 700 S. Park Avenue Titusville, FL 32780. The following present/former employees are expected to testify regarding the mental health services available at the Brevard County Jail Complex and/or Gregory Edwards' mental and physical health upon arrival at the facility. They are also expected to testify about the use of force and any medical treatment provided. Finally, they are expected to testify about BCSO's policies and training:

> **Witness:** Wayne Ivey (Sheriff)
> **Witness:** Darrell Hibbs (Deputy/Commander)
> **Witness:** Kelly Haman (Deputy/Major)
> **Witness:** George Fayson (Deputy/Lieutenant)
> **Witness:** Richard Zimmerman (Deputy/Sergeant)
> **Witness:** Brian Otto (Deputy/Corporal)
> **Witness:** Robert Wagner, Jr. (Deputy/Field Training Officer)
> **Witness:** Freddy Cedeno (Corrections Deputy)
> **Witness:** Andrea Mustafa (Deputy/Corporal in Control Room)
> **Witness:** Crystal ld.leburgh (Deputy/Corporal in Booking)
> **Witness:** Adam Hester (Corrections Deputy)
> **Witness:** Adam Turco (Corrections Deputy)
> **Witness:** Branden Hartley (Corrections Deputy)
> **Witness:** John Wright (Deputy/Corporal in Medical)
> **Witness:** Denise D'Agostino (Booking Technician)
> **Witness:** Sarah Papesh (Booking Technician)
> **Witness:** Jeanette Donaho (Booking/Control)
> **Witness:** Regina Ellis (Corrections Deputy/Corporal)
> **Witness:** Ryan Hummel (Corrections Deputy)
> **Witness:** Shannon Popielarczyk (Patty Wagon Driver)
> **Witness:** Stephanie Smith (Corrections Deputy)
> **Witness:** Dashawn Edward (Corrections Deputy)

3

**B.**     **Plaintiff issues the following disclosures pursuant to FED.R.CIV.P. 26(a)(2)(B) (Witnesses Who Must Provide a Written Report):**

**Witness:** To be determined.

**C.**     **Plaintiff issues the following disclosures pursuant to FED.R.CIV.P. 26(a)(2)(C) (Witnesses Who Do Not Provide a Written Report):**

Mr. Edwards received most of his medical care through the United States Veterans Affairs ("VA"). It is believed that these entities and the respective treating physicians will testify regarding Mr. Edwards' mental and physical health.

   a.  Viera VA Clinic, 2900 Veterans Way, Melbourne, FL 32940
   b.  Bay Pines VA Hospital, 9500 Bay Pines Blvd, St. Petersburg, FL 33708
   c.  William Bill Kling VA, 9800 W Commercial Blvd, Sunrise, FL 33351
   d.  Miami VA Medical Center, 1201NW 16th St Miami, FL 33125

Baker Acts

   a.  Rockledge Regional Medical Center, 110 Longwood Ave, Rockledge, FL 32955.
   b.  Miami VA Medical Center, 1201NW 16th St Miami, FL 33125.

In addition, it is believed that at some point in time during the last 10 years of Mr. Edwards' life, the Wounded Warrior Project arranged for and paid for Mr. Edwards to receive medical care at unknown private in-patient facilities.

Kathleen Edwards' mental health treatment following the death of her husband:

   a.  Retreat Behavioral Health, 1170 S. State Street, Ephrata, PA 17522
   b.  Helix Treatment Centers, 10383 Bonnie Lane, La Mesa, CA 91941
   c.  Solara Mental Health, 1321 Garnet Avenue, San Diego, CA 92109

**D.**     **Pursuant to FED.R.CIV.P. 26 (a)(1)(A)(ii), Plaintiff provides "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment":**

Plaintiff presently possesses the following documents:

1.  Death certificate
2.  Autopsy Report for Decedent
3.  Estate documents
4.  West Melbourne Incident 2018-00036323
5.  Booking Record for Decedent
6.  Four video clips of Walmart arrest and use of force
7.  BCSO Administrative Investigation 2018-CI-041 (34 Pages)
8.  BCSO Criminal Investigation 2018-00434257 (93 Pages)

4

9. BCSO Press Release announcing death
10. Office of State Attorney Press Release (7/1/2019)
11. Witness List
12. Armor Correctional Health Services Medical Records
13. Rockledge Regional Medical Center medical records (268 Pages)
14. BCSO Letter Response to Document Request (3/5/2019)
15. Open Letter Response to Florida Today (June 11, 2020)
16. State of Florida Medical Examiners Commission Memorandum (8/7/2015) RE District 18 Medical Examiner's Office
17. Doc. 71-17 of the docket 2:15-cv-06487 in the Supreme Court of the State of New York (Affidavit of Dorothea Caldwell-Brown, Esquire RE Armor)

**E.  Pursuant to FED.R.CIV.P. 26 (a)(1)(A)(iii), Plaintiff provides "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under <u>Rule 34</u> the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered":**

At the present time, "plaintiff must merely disclose 'the best information available' concerning the claim, however limited and potentially changing it may be." <u>Stemrich v. Zabiyaka</u>, No. 1:12-CV-1409, 2013 WL 4080310 (M.D. Pa. August 13, 2013) (<u>citing</u> Moore, § 15.02).  In this regard, Plaintiff is seeking compensatory and punitive damages to be set by a jury.

There are *<u>no damage caps</u>* available to either individuals or public entities for claims asserted pursuant to 42 U.S.C. § 1983. Based on the specific facts of this case, it is reasonably believed that a jury could return a verdict in an amount up to $25 million.

In addition, Plaintiff is seeking punitive damages against the individual defendants only for which the individual defendants could be held personally liable. The United States Supreme Court has held that there are certain due process standards that every punitive damages award must pass. <u>See</u>, <u>e.g.</u>, <u>State Farm Mut. Automobile Ins. Co. v. Campbell</u>, 538 U.S. 408, 425 (2003); <u>Gore</u>, 517 U.S., at 574–575. Although "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," <u>id.</u>, at 582, the Court has determined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," <u>State Farm</u>, 538 U.S., at 425; "[w]hen compensatory damages

are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id.

Finally, Plaintiff is also seeking to recover attorney's fees at the market rate and litigation costs as incurred.

**RESPECTFULLY SUBMITTED,**

s/ *Devon M. Jacob*
**DEVON M. JACOB, ESQUIRE**                                    **Date: May 5, 2021**
PA Bar ID: 89182
Email: djacob@jacoblitigation.com
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
Telephone: (717) 796-7733
*Counsel for Plaintiff (Pro Hac Vice)*

**BENJAMIN L. CRUMP, ESQUIRE**
FL Bar ID: 0072583
BEN CRUMP LAW, PLLC
122 S. Calhoun, Street
Tallahassee, FL 32301
844.638.1822 | ben@bencrump.com
*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA (Orlando)**

| | |
|---|---|
| **MARGARITA RODRIGUEZ-BONILLA,** | **: No. 6:21-cv-0428-JA-EJK** |
| **as the Successor Personal Representative of the** | **:** |
| **ESTATE OF GREGORY LLOYD EDWARDS,** | **:** |
| | **:** |
| **Plaintiff,** | **:** |
| | **:** |
| **v.** | **:** |
| | **:** |
| **WAYNE IVEY, et al.,** | **: CIVIL ACTION – LAW** |
| | **:** |
| **Defendants.** | **:** |

---

### CERTIFICATE OF SERVICE

---

I, Devon M. Jacob, Esquire, hereby certify that on the below referenced date, I served a

true and correct copy of this document, via Email, on all counsel of record.

**Respectfully Submitted,**

**s/ _Devon M. Jacob_**                                               **Date: May 5, 2021**
**DEVON M. JACOB, ESQUIRE**

# EXHIBIT C

**Kathleen Edwards  2/25/2022**

78

```
 1           But it's -- the retreat is at their
 2   facility in California.  And they have, like,
 3   therapists there.
 4       Q   Who took care of the funeral arrangements
 5   for Gregory?
 6       A   Wounded Warrior Project and his V.A.
 7   benefits.
 8       Q   Did you pay anything for Gregory's
 9   funeral?
10       A   I paid extra additional fees for his
11   casket, because I wanted him to have a nice casket.
12   And I paid for a D.J. for -- his mom had some type
13   of party for him.  And I paid for the D.J. and live
14   music, because Gregory liked -- he was a musician,
15   and he liked live music.  And I thought that was
16   important.
17       Q   Where did the funeral take place?
18       A   In West Palm Beach.  I don't -- it's the
19   Brown's Funeral Home.  I'm not sure.
20       Q   Where is Greg buried?
21       A   Greg's buried in the National Cemetery at
22   Cape Canaveral.
23       Q   Who paid for the headstone?
24       A   It's veteran benefits.
25       Q   Does your daughter get any survivor
```

Kathleen Edwards  2/25/2022

79

```
 1    benefits since Gregory's death?
 2         A    From social security, yes.
 3         Q    Does your daughter get any survivors
 4    benefits through the V.A.?
 5         A    No.
 6         Q    What type of social security survivor
 7    benefits does your daughter get?
 8         A    The benefits when your parents die.  I
 9    applied for it.  She got it.
10         Q    Is it a one time thing, or does your
11    daughter get a monthly benefit?
12         A    It's a monthly benefit until she turns 18.
13         Q    And how much is that monthly benefit?
14         A    It's approximately 1200 a month.
15         Q    Were there any Go-Fund Me's or anything
16    like that, that were set up after Gregory's death?
17         A    There was from someone in Brevard County
18    for, like, protests and stuff like that.
19         Q    Did you or your daughter receive any money
20    from any crowdfunding account?
21         A    No.
22         Q    Have you visited Gregory's grave since he
23    was buried?
24         A    Yes.  We were visiting on a regular basis,
25    but then when I was in and out of the hospital and
```

Kathleen Edwards  2/25/2022

80

1   relocating, I discontinued visiting.  I felt unsafe

2   in Brevard County after my arrest, so I stopped

3   going to Brevard County.  And I plan on relocating

4   his body.

5        **Q   When was the last time that you visited**

6   **Gregory's grave?**

7        A   I'm trying to think.  Last springtime.

8   Around last springtime.  I don't remember exactly.

9        **Q   Has your daughter been to any kind of**

10  **counseling since Gregory's death?**

11       A   Yes.  When he first died, I put her in

12  play therapy in Brevard County.  I paid for that

13  out of my own pocket.  She was only in it for no

14  more than three months.

15            And then I took her out of that.  And now

16  she's had some speech -- she wasn't speaking at

17  all.  And, so now I have her in speech therapy once

18  a week.

19            And I do not recall the therapist at -- in

20  Brevard County, because it's so long ago.  But the

21  speech therapy is with the State of Pennsylvania.

22  They come to her.  She goes to a private school,

23  and they come there once a week to work on her

24  speech.

25       **Q   Was your daughter home when your son**

# EXHIBIT D

AO 133   (Rev. 12/09)  Bill of Costs

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

MARGARITA RODRIGUEZ-BONILLA )
)
v. )     Case No.:  6:21-cv-428-JA-DAB
)
WAYNE IVEY, et al. )

## BILL OF COSTS

Judgment having been entered in the above entitled action on   March 7, 2023   against   Plaintiff   ,
                                                                                  _Date_
the Clerk is requested to tax the following as costs:

| | |
|---|---|
| Fees of the Clerk  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |
| Fees for service of summons and subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case . . . . . . | $4,632.20 |
| Fees and disbursements for printing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Fees for witnesses _(itemize on page two)_ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,800.00 |
| Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Docket fees under 28 U.S.C. 1923 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Costs as shown on Mandate of Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Compensation of court-appointed experts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Compensation of interpreters and costs of special interpretation services under 28 U.S.C. 1828  . . . . . | |
| Other costs _(please itemize)_ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| TOTAL   $ | $8,432.20 |

_SPECIAL NOTE:_  Attach to your bill an itemization and documentation for requested costs in all categories.

| Declaration |
|---|

I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed.  A copy of this bill has been served on all parties in the following manner:

[X]  Electronic service               [ ]  First class mail, postage prepaid

[ ]  Other:

s/ Attorney:      _s/ Thomas W. Poulton_

Name of Attorney:   Thomas W. Poulton

For:  Sheriff Wayne Ivey, George Fayson, Richard Zimmerman and Robert Wagner, Jr.     Date:   March 20, 2023
              _Name of Claiming Party_

| Taxation of Costs |
|---|

Costs are taxed in the amount of     $8,432.20                                     and included in the judgment.

Elizabeth Warren                    By:   _Natividad Rodriguez_              April 7, 2023
_Clerk of Court_                                  _Deputy Clerk_                          _Date_

# UNITED STATES DISTRICT COURT

| | ATTENDANCE | | SUBSISTENCE | | MILEAGE | | |
|---|---|---|---|---|---|---|---|
| **Witness Fees (computation, cf. 28 U.S.C. 1821 for statutory fees)** | | | | | | | |
| NAME , CITY AND STATE OF RESIDENCE | Days | Total Cost | Days | Total Cost | Miles | Total Cost | Total Cost Each Witness |
| Daniel Schultz<br>Tampa, Florida | 1 | $2,800.00 | | | | | $2,800.00 |
| Everett Keith Neely<br>Margate, Flolrida | 1 | $1,000.00 | | | | | $1,000.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | **TOTAL** | $3,800.00 |

## NOTICE

**Section 1924, Title 28, U.S. Code (effective September 1, 1948) provides:**
"Sec. 1924. Verification of bill of costs."
    "Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

**See also Section 1920 of Title 28, which reads in part as follows:**
    "A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree."

**The Federal Rules of Civil Procedure contain the following provisions:**
**RULE 54(d)(1)**

Costs Other than Attorneys' Fees.
    Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 day's notice. On motion served within the next 7 days, the court may review the clerk's action.

**RULE 6**

(d) Additional Time After Certain Kinds of Service.

    When a party may or must act within a specified time after service and service is made under Rule5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a).

**RULE 58(e)**

Cost or Fee Awards:

    Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2),  the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

# EXHIBIT E

AO 133   (Rev. 12/09)  Bill of Costs

# UNITED STATES DISTRICT COURT

for the

MIDDLE DISTRICT OF FLORIDA

MARGARITA RODRIGUEZ-BONILLA, )
)
v. ) Case No.: 6:20-cv-02235-JA-DAB
)
CITY OF WEST MELBOURNE, FLORIDA )
)

## BILL OF COSTS

Judgment having been entered in the above entitled action on __02/22/2023__ against __Margarita Rodriguez-Bonilla__ ,
Date

the Clerk is requested to tax the following as costs:

| | |
|---|---:|
| Fees of the Clerk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |
| Fees for service of summons and subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.00 |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case . . . . . | 2,357.20 |
| Fees and disbursements for printing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 302.22 |
| Fees for witnesses (itemize on page two) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.00 |
| Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 816.54 |
| Docket fees under 28 U.S.C. 1923 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Costs as shown on Mandate of Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Compensation of court-appointed experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Compensation of interpreters and costs of special interpretation services under 28 U.S.C. 1828 . . . . . | |
| Other costs (please itemize) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| TOTAL | $ 3,575.96 |

*SPECIAL NOTE:* Attach to your bill an itemization and documentation for requested costs in all categories.

| Declaration |
|---|

I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed.  A copy of this bill has been served on all parties in the following manner:

☑ Electronic service          ☐ First class mail, postage prepaid

☐ Other:

s/ Attorney: *Gail C. Bradford*

Name of Attorney: Gail C. Bradford, Esquire

For:          City of West Melbourne, Florida                    Date:   03/03/2023
Name of Claiming Party

| Taxation of Costs |
|---|

Costs are taxed in the amount of          $3,575.96                    and included in the judgment.

__Elizabeth Warren__          By: *Natividad Rodriguez*          March 27, 2023
Clerk of Court          Deputy Clerk          Date

# UNITED STATES DISTRICT COURT

| Witness Fees (computation, cf. 28 U.S.C. 1821 for statutory fees) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | ATTENDANCE | | SUBSISTENCE | | MILEAGE | | Total Cost Each Witness |
| NAME , CITY AND STATE OF RESIDENCE | Days | Total Cost | Days | Total Cost | Miles | Total Cost | |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | **TOTAL** | $0.00 |

## NOTICE

**Section 1924, Title 28, U.S. Code (effective September 1, 1948) provides:**
"Sec. 1924. Verification of bill of costs."
    "Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

**See also Section 1920 of Title 28, which reads in part as follows:**
    "A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree."

**The Federal Rules of Civil Procedure contain the following provisions:**
**RULE 54(d)(1)**

Costs Other than Attorneys' Fees.
    Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 day's notice. On motion served within the next 7 days, the court may review the clerk's action.

**RULE 6**

(d) Additional Time After Certain Kinds of Service.

    When a party may or must act within a specified time after service and service is made under Rule5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a).

**RULE 58(e)**

Cost or Fee Awards:

    Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2),  the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.